**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MENDO LOVE,

        Petitioner,                      Case No. 2:15-cv-14168

v.                                      HONORABLE PAUL D. BORMAN
                                      UNITED STATES DISTRICT JUDGE

PAUL KLEE,

        Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner, Mendo Love, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner is incarcerated at the Chippewa Correctional Facility in Kincheloe, Michigan. He challenges his convictions for first-degree premeditated murder and possession of a firearm during the commission of a felony ("felony-firearm"), claiming that he received ineffective assistance of counsel. Respondent, through the Attorney General's Office, has filed an answer in opposition to the petition, arguing that Petitioner's ineffective assistance of counsel claim is meritless. For the reasons set forth below, the Court denies the petition and denies a certificate of appealability.

**I.**

Petitioner's convictions arise from a December 3, 2010 shooting on Winthrop Street in Detroit, Michigan, which resulted in the death of Raymond Singleton, II.

Raymond Singleton, II had two brothers: Dontae and Sir Lawrence Nance. In December 2010, Sir Lawrence Nance was dating Petitioner's sister, Mercedes. On

December 3, 2010, Raymond, Dontae, and Sir Lawrence were at their family home, located at 14337 Winthrop, when Petitioner arrived with his cousin, Marquise. When the cousins arrived, Sir Lawrence was standing on the front porch and observed a white Cadillac parked outside his father's home. He also noted that Petitioner was wearing a baseball cap, but could not remember what it looked like. Dontae specified that it was a Michigan baseball cap. Raymond, Dontae, Petitioner, and Marquise sat in the basement, talking for ten to fifteen minutes before Petitioner and Marquise left to go to the liquor store. They came back with more liquor about twelve minutes later.

When the cousins returned, the conversation turned to an argument between Mercedes' mother and Sir Lawrence that had occurred earlier in the day that had upset Petitioner's mother. Despite the discussion of the earlier argument, the mood in the basement was calm. The cousins stayed at the home for about thirty minutes and then left for the second time, saying they were going to the liquor store and would return shortly. Raymond accompanied them, but Dontae and Sir Lawrence stayed home. Mr. Singleton's family learned at about 8:00 that evening that Raymond had been shot.

On the night of the shooting, Karl Long was at his cousin Earnest Johnson's house on Winthrop, and heard gunshots while sitting in the front room. They went out to the front porch and Mr. Long saw someone lying on the ground to the left of the house. He also observed a cream colored Cadillac and saw a person running toward it. When the individual reached the Cadillac, Mr. Long overheard him say "I got that mother fucker. He dead." (ECF No. 5-7 at 77.) The individual then ran away through the yard, dropping

2

his hat, and the driver of the Cadillac did a u-turn and drove away.  Mr. Long approached the victim on the ground to see if he knew who it was, but he did not know Mr. Singleton.

City of Detroit Police Officer Eric Carter was called out to 14011 Winthrop on December 3, 2010.  He and his partner, both plain clothes officers, were the first police on the scene of the shooting.  After clearing a crowd of people away from the scene, Officer Carter went to assist Mr. Singleton, who was on his side on the ground.  Mr. Singleton was bleeding and screaming that he had been shot and was going to die.  When Officer Carter asked who had shot him, Mr. Singleton replied loudly that it was "Mendo Love."  (ECF No. 5-7 at 44.)  He repeated the name at least three times.  EMS arrived to transport Mr. Singleton to the hospital, and Officer Carter and his partner canvassed the neighborhood.  About three houses south of where Mr. Singleton was lying on the ground, Officer Carter observed several shell casings and a discarded hat.  He ordered a canine officer to see if the hat could be used for tracking.

Officer Salisbury, a canine handler with the City of Detroit Police, arrived at the scene on December 3, 2010 with his tracking dog.  The canine was able to use the hat for tracking purposes, continuing northbound from where the hat was found and through an alley, until reaching the Big V Liquor Store ("Liquor Store") at 13963 Greenfield.  The dog stopped tracking near the pay phone in the parking lot of the Liquor Store.  Officer Carter obtained the store's surveillance video.

Ron Gibson, a sergeant with the Detroit Police Department and expert in the area of forensic video extraction, was then called to the Liquor Store to extract the

surveillance video. The video showed a light colored Cadillac parked between the curb and sidewalk in front of the store at 8:10 p.m. on December 3, 2010. An individual walked from the Cadillac to the store and then back to the car seven minutes later, at 8:17 p.m. The Cadillac pulled away from the curb onto Greenfield Avenue at 8:18 p.m., returned to nearly the same spot at 8:32 p.m., and pulled away three minutes later. The video then showed a canine officer's dog tracking to the building and entering at 8:56 p.m.

Eugene Fitzhugh, a Detroit Police Officer assigned to the crime scene services unit, was called to 14011 Winthrop on December 3, 2010, where he was tasked with photographing the scene, as well as documenting and collecting evidence. He completed a four-page scene report, including a sketch of the area. He found two 40-caliber shell casings and a cell phone battery at the scene. In the driveway between 13944 and 13934 Winthrop, he found a baseball cap with the letter "M" on the front.

Andrea Halvorson works in the biology unit of the Michigan State Police Crime Lab, and is an expert in DNA analysis. In the instant matter, she received swabs of a baseball hat, a known blood sample from Mr. Singleton, and a known buccal sample from Mr. Love. Ms. Halvorson found at least two donors associated with the baseball hat sample. The major donor was an unidentified male and she was unable to make a determination as to whether the minor donor was Mr. Love.

Amanda Crocker is a latent fingerprint expert with the Department of State Police. She processed the cell phone battery that was found at the scene of the shooting for latent prints, but found none of comparison value.

After a three-day trial in Wayne County Circuit Court, the jury deliberated for approximately one hour. At one point during the deliberation, the jury requested, among other things, the transcripts of the testimony of Mr. Singleton's brothers. The Court informed the jury that there were no transcripts and that they would need to use their "collective memories" to recollect the testimony. (ECF No. 5-8 at 74.) Both counsel agreed to this plan. After about 25 more minutes of jury deliberation, Petitioner was convicted of first-degree murder and felony-firearm. On September 26, 2012, he was sentenced to life without parole for the murder conviction, plus two years consecutive for the felony-firearm conviction.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising the claim that he was entitled to a new trial because the trial court failed to instruct the jury as to the tracking dog instruction and that transcripts of witnesses' testimony could be made available, and that his trial counsel was ineffective for failing to request the instruction and agreeing to the instructions as given.

The Michigan Court of Appeals affirmed the conviction. *People v. Love*, No. 314439, 2014 WL 2118266 (Mich. Ct. App. May 20, 2014). Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claim raised in the Michigan Court of Appeals. The Michigan Supreme Court denied leave to

appeal. *People v. Love*, 497 Mich. 904 (2014). Petitioner then filed the instant petition for habeas relief, asserting that his trial counsel was ineffective.

## II.

The petitioner's claims are reviewed against the standards established by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (*quoting Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that

6

principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (*quoting Williams*, 529 U.S. at 413). However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Put another way,

> Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 102-03 (internal quotation marks and citation omitted).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams,* 529 U.S. at 412. Section 2254(d) "does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). "[W]hile the principles of "clearly established

7

law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007), *citing Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

Lastly, a federal habeas court must presume the correctness of state court factual determinations. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

### III.

Petitioner argues that his trial attorney was ineffective. Specifically, he claims counsel was ineffective in: (1) failing to request the tracking dog evidence instruction, set forth in the Michigan Model Criminal Jury Instructions; and (2) agreeing to the court's refusal to provide transcripts of the testimony of Mr. Singleton's brothers, per the jury's request. Respondent counters that the Michigan Court of Appeals' holding that Petitioner was not denied the effective assistance of trial counsel was reasonable, and therefore cannot be disturbed.

To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner may show that counsel's performance was deficient by establishing

8

that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 689. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687.

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court's review of counsel's performance must be "highly deferential." *Id.* at 689. Habeas relief may be granted only if the state-court decision unreasonably applied the standard for evaluating ineffective-assistance-of-counsel claims established by *Strickland*. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Id.* at 123 (internal quotation marks omitted).

Petitioner first argues that trial counsel erred by failing to request the tracking dog evidence instruction as set forth in the Michigan Model Criminal Jury Instructions, which provides as follows:

> You have heard testimony about the use of a tracking-dog. You must consider tracking-dog evidence with great care and remember that it has little value as proof. Even if you decide that it is reliable, you must not convict the defendant based only on tracking-dog evidence. There must be other evidence that the defendant is guilty.

9

Mich. M Crim. JI 4.14.  During the trial, Officers Carter and Salisbury testified as to the canine officer's tracking of the baseball hat, which led them to the pay phone of the Liquor Store, and ultimately to the video evidence of a light colored Cadillac.  The Michigan Court of Appeals concluded that the "tracking dog evidence presented at trial was relatively minor in the context of the evidence as a whole" and that counsel may have therefore determined that a dog-tracking instruction would not be helpful.  *Love*, 2014 WL 2118266, at *2.  The Court of Appeals further reasoned that, even if trial counsel's performance had been deficient in some way, the trial outcome would not have been different because evidence of Petitioner's guilt was "overwhelming."  *Id.*

There is nothing unreasonable in the Michigan Court of Appeals' decision with respect to the jury instruction.  A review of the trial transcript demonstrates that the tracking-dog evidence was relatively minor, in light of other evidence, such as Mr. Singleton's identification of Petitioner as the person who shot him and Mr. Long's testimony that he saw a person wearing Petitioner's hat shout that he "got" the victim and that the victim was "dead."  (ECF No. 5-7 at 77.)  Mr. Long also testified to seeing the cream-colored Cadillac at the scene, which was later identified in the video footage from the Liquor Store, making the video evidence brought to light by the tracking dog somewhat redundant.  It is reasonable to assume that counsel simply considered the jury instruction to be unimportant and focused attention on other matters more relevant to the evidence in the case.  *See Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (the reviewing court is "required not simply to give [the] attorneys the benefit of the doubt, but to

affirmatively entertain the range of possible reasons [counsel] may have had for proceeding as they did." (internal quotation marks and citation omitted) (second alteration added)). For example, the Court gave an instruction related to how to weigh the evidence of an out-of-court statement made by Petitioner, which was likely much more important to his case than how to weigh the tracking dog evidence. (ECF No. 5-8 at 59.) As such, Petitioner's trial counsel was not ineffective in failing to request a dog-tracking jury instruction.

Petitioner also argues that trial counsel was ineffective because he acquiesced to the trial court's instruction to the jury relating to the availability of trial transcripts. Specifically, during its deliberations the jury requested the testimony of Mr. Singleton's brothers, Sir Lawrence and Dontae. The court, with both counsels' agreement, informed the jury that:

> We don't have transcripts of testimony. Okay? The good reporter here takes a recording of what is being said and you can see that . . . it's being recorded, but it's not - - there's not a transcript of that at this point. It has to be physically prepared and that's not done at this juncture. Okay?
>
> So what I would ask you to do - - and I know this is difficult at times - - but take each person's testimony, use the chalkboard back there and the 12 of you should be able to collectively recollect the testimony of each individual who testified. And just write down a few salient points. That tends to work for people.

(ECF No. 5-8 at 74.) The jury responded to this instruction, noting that the information had been requested "knowing that perhaps it wouldn't be there." (*Id*. at 75.)

Trial counsel's agreement to the court's instructions to the jury related to the testimony of Mr. Singleton's brothers was not ineffective for two reasons. First, the

11

Michigan Court of Appeals concluded that the trial court's instruction was consistent with Michigan Court Rule 2.513(P), because it did not foreclose the possibility of having the testimony reviewed at a later time. It is not the province of this Court to reexamine the Michigan Court of Appeals' interpretation that the trial court's instruction complied with Michigan law. *See Estelle v. McQuire*, 502 U.S. 62, 67-68 (1991) (noting that it is not "the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Second, it is reasonable to surmise that trial counsel made this decision as part of a strategy to keep the specifics of the brothers' damaging testimony out of the hands of the jury during deliberations. As the Michigan Court of Appeals explained, the testimony at issue was "generally damaging to [Petitioner] at trial," because both brothers testified that Petitioner had been present at the house with Mr. Singleton right before the shooting, and "wearing the same hat observed at the scene of the shooting." *Love*, 2014 WL 2118266 at *3. In sum, there is no indication that trial counsel was ineffective and the Michigan Court of Appeals' dispensation of this matter was reasonable. Accordingly, habeas relief is denied.

### IV.

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted). In this case, the Court concludes that reasonable jurists would not debate the conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted. Therefore, the Court will deny a certificate of appealability.

For the reasons stated above, the petition for a writ of habeas corpus and a certificate of appealability are **DENIED** and the matter is **DISMISSED**.

**SO ORDERED.**

                                                  s/Paul D. Borman
                                                  Paul D. Borman
                                                  United States District Judge

Dated: September 7, 2017

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 7, 2017.

                                                  s/D. Tofil
                                                  Deborah Tofil, Case Manager